# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF DAKOTA TERRITORY.

5    1
5   461
37* 717
41* 674

HANNAHER et al., Respondents, v. ST. PAUL, MINNEAPOLIS & MANITOBA RAILROAD Co., Appellant.

**1. Railroads — Construction of Road — Liabilities for Surface Water.**

In an action against a railroad company for overflowing land with surface water through alleged negligence in the construction of its road, it appeared that plaintiff, prior to the construction of the road, for a valuable consideration, had granted to the company the right of way over the premises for railroad purposes; that it had constructed the road in the usual and ordinary way under the circumstances, and with ordinary skill and precaution. *Held*, that the plaintiff had no right of action.

**2. Same—Instructions—Invading Province of Jury.**

In an action against a railroad company for damages in overflowing land with surface water through alleged negligence in the construction of its road, where the plaintiff, for a valuable consideration, had granted the company the right of way over the premises, the court instructed the jury a recovery could not be had for ordinary damages, but the damage caused, if any, by the discharge of large and unusual quantities of waters from other lands, if such occurred, would not be ordinary damage. *Held* error in determining by the court what is ordinary damage, and giving the jury to infer that, while the company might not be liable for ordinary, it would be for extraordinary, damage caused by the construction of the road over the premises.

(Argued February 5, 1887, reversed February 16; opinion filed February 7, 1888.)

v.5DAK.—1

Appeal from district court of Cass county; Hon. W. B. Mc-
Connell, Judge.

*J. King* and *Wilson, Ball & Wallin*, for appellant.

The plaintiffs charge negligence. The defendant contends
that it does not appear that the building of the railroad caused
the alleged damage to plaintiffs' property; but if it should be
shown that the damage was the result of building the railroad
properly, and with due care, that an action will not lie for such
damage. Defendant submits that it has an undoubted right,
by virtue of its corporate franchises, to build a line of railroad
upon its own land, provided that the road is built properly, and
with due care.

In the case at bar the defendant claims that the overwhelm-
ing weight of testimony shows that defendant's line of road, in-
cluding embankment, ditches, and culverts, was built with due
care, and in the usual, and, in fact, the only proper manner
yet discovered of constructing a railroad through flat and level
regions, such as those under consideration.

The testimony shows that whatever injury or damage the
plaintiffs may have suffered from the overflows of water in the
years 1881 and 1882 was the direct consequence of unusual, ex-
cessive, and continued rains occurring in those years, which
caused floods of surface water to accumulate, stand upon, and
flow over extensive bodies of land situated in the vicinity of
plaintiff's land, and not affected in any way by the railroad, but
was the result of natural causes.

It is elementary that no action will lie for "lawful acts law-
fully done, though some actual hurt or loss result to some per-
son therefrom." 1 Suth. Damages, 3, 4; Cooley, Torts, 688.
See, also, page 81.

The defendant's right of way was acquired by purchase of
the plaintiffs.

"The consideration of the deed is deemed to stand in the place
of the damages which would have been assessed by commission-

ers acting under the statute, and is understood to embrace compensation for all damages reasonably to be expected to flow. from the construction and maintenance of the work, if done in a proper manner, and without negligence." 1 Thomp. Neg. 570. See, also, page 569, and authorities cited in note 2.

The court erred in its instruction with reference to the discharge of unusual quantities of water, if any, upon the plaintiff's land. It distinctly informs the jury that if the proper construction of the embankment resulted in damaging plaintiff's land, by causing large and unusual quantities of water to be discharged upon it, that such damages would not be ordinary damages arising from the proper construction of the embankment.

We have shown, and it is well settled, that the defendant acquired, by its deed of conveyance, all rights which could be acquired by a statutory condemnation, and that as to such damages and injuries as are taken into account and compensated for by statutory proceedings, no common-law action will lie. See, also, Pierce, Railroads, 177.

Section 452, C. C., is very broad, and invests the commissioners with plenary powers with respect to awarding damages to the land-owner whose land is taken for railroad purposes.

Under similar statutes it has been generally held by the courts that the sum awarded the land-owner by the commissioners is a full compensation to him for any damages resulting from the proper construction of the railroad over his lands; but, on the other hand, such award does not include damages resulting from want of care or negligence in the construction of the road. Wood, R. R. L. pp. 795, 796, § 245.

The liability of throwing an unusual quantity of water upon lands adjoining a railroad embankment, and constructed over low and flat lands, would be considered and paid for in an award by commissioners, and consequently no action will lie for such damages. 44 Mich. 222; Walker v. Old Colony & N. R. Co., 103 Mass. 10; cited with approval, 28 Minn. 510.

The instruction is open to the further objection that it in-

vades the province of the jury as to the main question, *i.e.*, that of causing damage by negligence.

Consideration of the charge of the trial court necessarily involves a discussion of the rights of individuals and corporations with respect to surface water.

"Every man has a clear legal right to protect his premises against the fall of rain or snow, even though incidental injury may result to his neighbor in consequence." Cooley on Torts, 574; *Goodale* v. *Tuttle*, 29 N. Y. 466; *Barkley* v. *Wilcox*, 86 N. Y. 140; *O'Conner* v. *Fond du Lac, A. & P. R. Co.*, 52 Wis. 526, 9 N. W. Rep. 287; *Cannon* v. *Hargadon*, 10 Allen, 106; *O'Brien* v. *City of St. Paul*, 25 Minn. 331.

It will be claimed that the supreme court of Minnesota has reversed itself in *Hoganon's Case*, 31 Minn. 226, 17 N. W. Rep. 374. We think otherwise. The latter case had to do with the question of tapping a reservoir of water, and conveying it out in the country by a canal-like ditch, three and a half miles in length, and is not a case similar in its facts to the *O'Brien Case*, nor to the case at bar.

We concede that the adjudications upon the right to dispose of surface water are not harmonious. 2 Wood, R. L. 886. Nevertheless few, if any, decisions can be found which have mulcted a railroad company in damages for using its side ditches and culverts, properly placed and constructed, as a means of preventing its embankments from destruction by rain. To deny this privilege would be equivalent to suspending rail-road building in low and flat sections of country.

Negligence did not cause the water to be collected and discharged upon the land, and, the plaintiffs having failed to prove their complaint, the court ought to have directed the verdict.

*C. A. Pollock* and *Stone & Newman*, for respondents.

While it is not claimed by respondents that the railroad company did not construct a proper embankment, ditches, and culverts for railroad purposes, it is contended that they did so

negligently construct such embankments, ditches, and culverts as to cause large quantities of surface water to accumulate in such ditches from large tracts of surrounding country, and to be conducted to and discharged upon the lands of the respondents in large and unusual quantities, and with great force, and in a manner entirely different from the manner in which surface water formerly found its way to respondents' lands.

Respondents do not complain that by reason of the embankment of appellant the surface water which usually fell or accumulated upon their lands was prevented from flowing off in its usual course, but they do complain that large quantities of such water which had never before found its way to their lands were collected from the surrounding lands, and were by means of these ditches and culverts, and their negligent construction, conducted to and discharged upon their lands in large streams, and in quantities and manner entirely unusual, and that by the exercise of ordinary care and skill in the construction of its road-bed, ditches, and culverts, the appellant might have entirely prevented this large and unusual flow of surface water to respondents' lands and the consequent injury.

It is claimed by appellant that the right exists in it to use its own property in its own way, without reference to the property of adjacent owners, and that it is under no obligation to make any provision whatever for the disposition of any surface water which may fall or collect upon or pass over the lands through which its road is built.

We do not question the principle that the appellant is the owner of all surface water which may fall or stand upon its land, or flow over or under its surface, which does not form any definite stream. Such is the rule declared by the C. C. § 255.

This surface water is the property of appellant, and in its management and disposition it must exercise the same care that it is required to exercise in the management and disposition of any other property belonging to it. The rule defining the degree of care necessary to be observed by appellant is declared in section 979, C. C.

The owner of land may dig as deep or build as high upon it as he pleases, but in such digging or building he must use ordinary and reasonable care to protect adjacent property from unnecessary injury.

The rule adopted by the court below seems to us just, equitable, and in entire consonance with the provisions of the Code. It is much more favorable to appellant than that laid down in any of the cases. See *Boughton* v. *Carter*, 18 Johns. 405; *Radcliff* v. *Mayor, etc.*, 4 N. Y. 195; *Foote* v. *Bronson*, 4 Lans. 46; *Wagner* v. *Long Island R. R. Co.*, 2 Hun, 635; *Jutte* v. *Hughes*, 67 N. Y. 267; *Bastable* v. *Syracuse*, 8 Hun, 587, S. C. 72 N. Y. 64; *O'Brien* v. *City St. Paul*, 25 Minn. 331; *Gould* v. *Booth*, 66 N. Y. 62; *Noonan* v. *Albany*, 79 N. Y. 476; *Vennun* v. *Wheeler*, 35 Hun, 54; *Mitchell* v. *New York, L. E. & W. R. R. Co.*, 36 Hun, 178; *Saal* v. *Abells*, 20 N. Y. Wkly. Dig.; *Pettigrew* v. *Village Evansville*, 25 Wis. 223, approved in *Hoyt* v. *Hudson*, 27 Wis. 656, and *O'Connor* v. *Fond du Lac, A. & P. R. R. Co.*, 52 Wis. 52, 9 N. W. Rep. 287; *Waterman* v. *Conn. & Pass. R. Ry.*, 30 Vt. 610; *White* v. *Chapin*, 12 Allen, 520; *Curtis* v. *Eastern R. R. Co.*, 98 Mass. 428; *Hoganon* v. *St. Paul, M. & M. Ry. Co.*, 31 Minn. 226, 17 N. W. Rep. 374; *Livingston* v. *McDonald*, 21 Ia. 160; 1 Western Jur. 12. We have no complaint to make of the rule of the cases cited by appellant from New York and Massachusetts. Their doctrine has been approved by cases like this cited by us from New York and Wisconsin.

Above we have not cited any cases from states which have adopted the more liberal rule of the civil law, preferring to confine our citations to states whose decisions are relied on by appellant. We refer the court, without quotation, to *Kauffman* v. *Griessmer*, 26 Penn. St. 407; *Martin* v. *Riddell*, 26 Penn. St. 315; *Laimier* v. *Francis*, 23 Mo. 181; *Butler* v. *Peck*, 16 Ohio St. 334; *Gilhaler* v. *Madison Ry. Co.*, 49 Ill. 484; *Nevins* v. *City of Peoria*, 41 Ill. 502; *Toledo & C. R. R. Co.* v. *Morrison*, 71 Ill. 610; *Gillingham* v. *Madison Ry. Co.*, 49 Ill.

484; *Gormley* v. *Sanford*, 52 Ill. 158; *Osborn* v. *Conner*, 46 Cal. 347; *Martin* v. *Jett*, 12 La. 502; *Bowman* v. *City of New Orleans*, 27 La. 501; *Delahousie* v. *Judice*, 13 La. 587; *Tillotson* v. *Smith*, 32 N. H. 90; *Bassett* v. *Salisbury Manuf'g Co.*, 43 N. H. 567; *Indianapolis* v. *Sawyer*, 38 Ind. 348; *Miller* v. *Pilgrim*, 7 Ill. 134; *Cairo* v. *Vincennes R. R. Co.*, 73 Ind. 278; *Templeton* v. *Vashlen*, 72 Ind. 134; *Adams* v. *Walker*, 34 Conn. 466; *Ashley* v. *Port Huron*, 35 Mich. 296; *Rhodes* v. *Cleveland*, 10 Ohio, 159; *Aurora* v. *Fillet*, 56 Ill. 132; *Same* v. *Reed*, 57 Ill. 29; *Miller* v. *Sambach*, 47 Pa. St. 154; Cooley, Torts, 574.

What would be ordinary care and skill must be determined by the surface and nature of the country through which the road was built, and the circumstances of the particular case, and is a question for the jury. *Waterman* v. *Conn. & Pass. Rivers R. R. Co.*, 30 Vt. 610, *supra*.

It is conceded that the rights of the appellant under its deed are the same as they would have been under condemnation pro-. ceedings, but it is bound to use the same care in the construction of its road. 1 Redf. Railways, (5th Ed.) § 61, subd. 5, and cases there cited. And neither compensation nor condemnation proceedings or voluntary conveyance will operate as a release of damages resulting to the lands of respondents from the improper or negligent construction of the road over their lands. 1 Rorer, Railroads, 405; *Ludlow* v. *Hudson River R. R.*, 6 Lans. 128.

The rule is that no action can be maintained for an injury resulting from the due, proper, and careful prosecution of the work authorized by law; and injuries arising from negligence, want of skill, improper construction of the work, or other wrong done by the corporation in or about the execution or maintenance of it, are not to be anticipated by the commissioners, but may be redressed if they happen, by an action. 1 Thomp. Neg. 569; Wood, Ry. L. § 208; *Smith* v. *New York & O. M. R. R. Co.*, 63 N. Y. 59; *Pflegar* v. *Hastings & D. Ry. Co.*, 28 Minn. 510, 11 N. W. Rep. 72; 2 Wood, Ry. Law, 885, note 1.

Tripp, C. J.    This is an action brought by the plaintiffs to recover damages for injury to their crops during the years 1881–82, by overflow of surface water, alleged to have been caused by the negligent construction of the road-bed, ditches, and culverts of the defendant railway company.    The complaint substantially alleges that:

1. Defendant's railroad runs in a south-easterly and north-westerly direction upon a road-bed and embankment raised about two feet above the surrounding country.

2. That under its road-bed it constructed a culvert near to plaintiffs' land, which culvert connected with the ditch which was at the same time constructed by the defendant, and which extended along the west side of the embankment, and parallel with it, for several miles.

3. That prior to such construction the water falling or coming upon the land lying west, south-west, and north-west of plaintiffs' land for several miles ran its natural course towards the north-east, and away from plaintiffs' land, into coulees and depressions, and thence into the Red river, without coming on or injuring plaintiffs' land.

4. That defendant carelessly and negligently constructed said embankment, culvert, and ditch, and thereby caused large quantities of water to become dammed up on the west side of said embankment, and collected in said ditch, and diverted said water from its ordinary course, and caused it to be conducted through said culvert over and upon plaintiffs' land in large and unusual quantities.

5. That defendant also carelessly and negligently constructed a ditch on the east side of, and parallel to, its road-bed for several miles, in a south-easterly direction, and thereby caused large quantities of water from defendant's and other surrounding lands to be conducted and diverted through said ditch upon plaintiffs' land in large and unusual quantities.

6. That by reason of such negligent and improper construction plaintiffs' land was overflowed, and their crops destroyed.

The gist of the action is the negligent construction of the

embankment, ditches, and culvert described in the complaint.

The answer puts in issue the allegations of the complaint, and affirmatively alleges the proper construction of the road-bed, its embankments, ditches, and culverts.

The defendant before the trial moved for judgment upon the pleadings, and at the close of the case asked the court to direct a verdict for the defendant, which motion and request were denied, and exceptions duly taken. The defendant also asked certain instructions of the court to the jury, which were refused, to which exceptions were taken, and also numerous exceptions to the charge given to the jury by the court upon its own motion, all of which will be noticed more fully hereafter. Numerous other exceptions were taken at the trial, and were urged in this court, but will not be noticed in this opinion, and are not necessary to be considered in the view we have taken of this case.

A careful examination of the pleadings and evidence shows that the railroad ran in a south-easterly and north-westerly direction, intercepting the natural flow of surface water, which ran in a north-easterly direction, diagonally, or nearly at right angles; that the entire surface of the country is one extended plain or level, with no elevations or depressions of more than a few feet or inches; that there were no natural water-courses on or near the premises in controversy, or within reach of said right of way, into which such surface water could be drained; that the depressions, or coulees, through which the surface water reached, and was drained into, the Red river, were lower levels of the prairie, or depressions of the surface, having no defined banks or bed, but were filled and covered with the continuous grass of the prairie, though sometimes such grass was of the coarser and ranker variety than that which grew upon adjacent lands; and such depressions were usually dry, like the other portions of the prairie, except in times of high water or melting snows.

That the plaintiff, for a valuable consideration, conveyed to the defendant the right of way, for railway purposes, across the

premises alleged to have been overflowed, before the construc-- tion of the embankment, ditches, and culvert complained of.

While the gist of the action was the negligent construction. of the embankment, ditches, and culvert in question, it seems. to have been clearly established by the evidence, and to have been practically admitted at the trial, and it was admitted in this court, that the embankments, etc., complained of were prop- erly constructed for railroad purposes. Counsel for respondents in his brief commences by saying: "It is not claimed by respond- ents that the railroad company did not construct a proper em- bankment, ditches, and culverts for railroad purposes;" but respondents claimed that the defendant should have so con- structed its road that the surface water would not have flowed upon the premises in greater quantities, or in a different man- ner, from what it naturally was wont to flow, and that if by the construction of its embankments, ditches, and culverts, though. constructed in the usual and ordinary manner, larger quantities. of surface water were permitted to accumulate, and were dis- charged upon plaintiffs' land in an unusual manner, whereby they sustained injury, the defendant was liable in an action for damages for such injury.

The action was commenced as one of negligence for the care- lessly and negligently doing of a lawful act,—the careless and negligent construction of its embankment, ditches, and culverts,. which it had a lawful right to construct in a careful and proper manner; it ends in an action of trespass, or the doing of an unlawful act in an unlawful manner.

The theory upon which the action was commenced, and the. theory upon which it was tried, are antagonistic, and cannot both be maintained upon the same state of facts. The act of constructing the embankment, etc., cannot be wrong and right. at the same time. It was, or it was not, negligently constructed; and, if it was not negligently constructed, the plaintiffs' cause of action failed. In the court below the testimony on both sides. was to the effect that defendant's railroad was constructed in the usual and customary manner; that the excavations at the:

sides were the usual ones made to obtain earth to form the embankments, and were usual in size and extent; that the embankment was of the usual height in prairie countries, and the culverts were of the ordinary and usual size and number.

John D. White, an engineer of experience, called by the plaintiffs, testified as follows: "*Question.* Mr. White, what is the elevation of this road-bed through that country? *Answer.* It is about two feet. It varies a little either side of that. And the road-bed conforms, in a general way, to the topography of the country. *Q.* You say you have had some experience in railroad building? *A.* Yes, sir; I have had a little experience in that kind of work. Part of that was in this country. I located a little line here. *Q.* Is this railroad. constructed in the usual and customary manner of constructing railroads in open prairie countries? *A.* Yes, sir. *Q.* Properly constructed, is it not? *A.* It is not constructed exactly as I would construct a railroad if I was going to do it, but it is constructed as is generally done in the country. The road-bed is the same as railroad beds are generally made,—by excavating at the side of the track to get earth enough to make the road-bed. *Q.* Is not that the best method of doing? *A.* That is the only method of doing that I know of, in regard to getting an embankment. *Q.* And these culverts are such culverts as are usually and customarily put into railroads? *A.* Yes, sir. *Q.* To allow an escape of water? *A.* Well, I think it is generally not to look for so great an amount of water,—just to provide communication between different ditches, if there is a drainage level between one side and the other, and let all the water go in that direction. The culverts are the ordinary culverts that are put into all the railroads. They are properly constructed. *Q.* And there is the usual number of culverts in this distance that there would ordinarily be in a low, flat country, are there not? *A.* Yes, sir; there are as many as are customary. *Q.* And they are made to conform to the topography of the country, are they not? They are put in where the natural flow of water would be to the lowest points? *A.* They are; yes, sir; in regard to these ditches.

*Q.* Well, these ditches, as you say,—you do not call them ditches; they are excavations? *A.* They are excavations. *Q.* And it is usual and customary to excavate, and not to ditch? *A.* Yes, sir. * * * *Q.* These culverts are how far apart, Mr. White? *A.* I think about three-quarters of a mile; am not certain. *Q.* You say they are put along here in that stretch of road as frequently as it is customary to put in culverts over flat country? *A.* Yes, sir; they are three-quarters of a mile on an average. *Q.* Of course, if there was any embankment there at all, the tendency would be to obstruct the natural flow of water, would it not? *A.* If there is a flow in that direction. *Q.* Well, is it not customary, across a country like that, to construct a road upon piling, or all culverts, in order to prevent diverting the natural flow of the water? *A.* No, sir; not in that kind of a country at all. *Q.* We have put in here the ordinary and usual number of culverts for the conveyance of water, in the construction of railroads, have we not? *A.* There are as many culverts, I should say, as there are ever put into railroads in that distance. There is a question of drainage in regard to the location of culverts."

And the testimony of the other witnesses and experts called by the plaintiffs and defendant were substantially to the same effect. The evidence also unmistakably shows that the excavations at the sides of the railroad, and upon the defendant's right of way, were not ditches constructed to carry off the surface water, but were only the usual and ordinary cuts and excavations made to obtain the earth of which the embankments were constructed, and that they were, as is usually the case, deeper at or near the depressions of the surface, and of less depth at or near the elevations. And the contention at the argument in this court was not, as alleged in the complaint, that the defendant had constructed a ditch along its right of way, but that it should have done so, and thereby have carried off the surplus water to a distant coulee, instead of collecting it in reservoirs, and discharging it by culverts upon the plaintiffs' land.

At the close of the testimony the defendant asked the court

to instruct the jury that, "if the water which accumulated on the west side of the embankment was mere surface water, the defendant has a right to get rid of it; and if it built the culvert, into which it was discharged, in a proper manner, and in a proper place, the defendant cannot be made liable for any damage, if any, caused by such overflow on the plaintiffs' land." And also that "the plaintiffs, having acquiesced in the building of the railroad across the land in question, after the building of the embankment, and knowing that such embankment would be maintained by the defendant, cannot recover for the ordinary damage, if any, arising from a proper construction of such embankment." The court declined to give the instructions asked, but instructed the jury as follows: "The plaintiffs having acquiesced in the building of the railroad across the land in question, after the building of the embankment, and knowing that such embankment would be maintained by the defendant, cannot recover for the ordinary damage, if any, arising from a proper construction of such embankment; *but the damage caused to the plaintiffs' land, if any, by the discharge of large and unusual quantities of water from other lands, if such discharge occurred, would not be ordinary damage arising from the proper construction of such embankment.*" To which refusals to charge, and to the giving of which instruction as modified, the defendant excepted, and alleges the exceptions as error here.

The theory upon which the case was tried and submitted to the jury, and upon which it is sought to sustain the judgment here, is, as already suggested, that although the road-bed was constructed in the usual and ordinary manner, and although its embankment, ditches, and culverts complained of were constructed with the care and skill usual and customary in the construction of other roads, yet because the surface water naturally flowing upon plaintiff's land was interrupted and disturbed thereby, and they suffered injury therefrom, the defendant is liable in an action of tort for damages; that although defendant had a right to do what it did, and although the act complained of was done in the usual and ordinary manner, with the usual

and ordinary care and skill, yet it is liable as a trespasser for the injury which is caused by its lawful acts so done in a lawful manner.

It is not necessary to follow counsel into the learning of the books, or the niceties of discussion found in the decisions of the courts, to determine whether the doctrine of the civil or common law is most adapted to our western habits, character, and civilization. If the plaintiffs can recover at all upon the case made, and upon the theory contended for, they can recover irrespective of the doctrine of the common or civil law. The defendant could not, by the rule of either the civil or common law, collect large bodies of surface water upon its own premises by artificial means, and eject the same by unnatural streams, and in unusual quantities, upon the land of another, without a license or authority so to do. And this brings us to the nub of this case, the pivotal point upon which the plaintiffs' argument rests, if they may be permitted to maintain this action upon the theory now advanced, and under the pleadings as they yet stand.

Conceding the road, with its embankments, ditches, and culverts, to have been constructed with the ordinary skill and care generally bestowed upon such work in the construction of other roads, and that it was authorized to build and construct its road across plaintiffs' premises by their express grant, can they maintain this action for damages for one of the injuries sustained by reason of such construction? It will be conceded that the company obtained, under their deed from plaintiffs, all the rights which it would have obtained by condemnation under the statute. This has been uniformly held by the courts, and the doctrine is announced by the text-writers upon this subject as follows: "The same effect is given to a deed, made to the company by a land-owner, of so much land as the company would otherwise be entitled to condemn for the erection of its works. The consideration of the deed is deemed to stand in place of the damages which would have been assessed by commissioners acting under the statute." 1 Thomp. Neg. 570. And the question now occurs, what rights did the defendant

·company, by virtue of its charter, obtain under the deed, or what rights would it have obtained by condemnation proceedings under the statute? The right of way is generally understood to embrace a right to do all and everything within its limits necessary for the proper construction and maintenance of its road, within the powers conferred by its charter. And the compensation made is understood to cover all the damages naturally arising, and reasonably expected to flow, from the proper ·construction and maintenance of such a road. Thompson says: "It is understood to embrace compensation for all damages reasonably expected to flow from the construction and maintenance ·of the work if done in a proper manner, and without negligence." 1 Thomp. Neg. 570.

What would be a *proper* construction of a railroad, and what would be a *proper* construction of its embankment, ditches, and ·culverts? Would it not be a fair standard for commissioners and jurors, in estimating the damages likely to accrue to adja- ·cent land-owners from the construction of the railroad across their lands, to bring to their aid their knowledge and experience as to how other roads of a similar character were usually constructed, and what would be the damages which would ordina- .rily and naturally occur from such construction? And, in absence of any special profile of the road submitted for their con- ;sideration, would they not act properly in presuming that the road would be constructed in the usual and ordinary manner, .and that the ordinary and usual damages would result? And if the road were constructed in the usual and ordinary manner ·contemplated by the parties to the contract for the right of way, or by the commissioners in the proceedings for condemnation, would it not be constructed in a proper manner? Can .a party be said to be negligent in doing a lawful act in a proper manner? These questions contain their own answers, and ·do not admit of argument. If, as plaintiffs admit, "it is not ·claimed that the railroad company did not construct a proper ·embankment, ditches, and culverts for railroad purposes," then the defendant was not negligent in their construction, and the

embankment, ditches, and culvert were proper ones, for the de-- fendant was constructing such works for *railroad purposes* only. The company was not building embankments, digging ditches, and erecting culverts for the benefit of plaintiffs or any adjacent. land-owners especially. It is true that railroad companies are: to a certain extent public corporations, and are presumed to act. for the public benefit, and upon that theory the corporation is. given rights of eminent domain, and other public rights; but it. is not presumed to be running its lines of road across plaintiffs' farm, and the farms of others, for their benefit; on the con-- trary, the law presumes the company does so to their injury, and requires it, as a condition precedent, to make payment of' all damages arising from such burdens imposed and injuries. sustained. The company condemns or purchases its right of' way for *railroad purposes.* It builds its road, with its embank-- ments, ditches, and culverts, for *railroad purposes,* and it is only· required to construct its road in a manner suitable and proper· for *railroad purposes.* And in payment for its right of way it. is required to make compensation for the injuries sustained by the adjacent land-owners by the use of such right of way granted, or condemned for *railroad purposes.* And as the company is. required to pay such damages as may reasonably and naturally· follow from the occupation of its right of way for *railroad pur-- poses* only, it can use such right of way for no *other purpose,.* and a failure to make use of such right of way for such purpose,. and its use for another and foreign purpose, forfeits its rights. and determines the use, and it reverts to the original owner, under· the statutes of many of the states; and in all the use of the: right of way for other than *railroad purposes* may be restrained, by the owner of the fee. It follows, as a necessary corollary, that, if the injury complained of was a natural and probable re-- sult of the construction of the railroad along the right of way· granted by plaintiffs, it was compensated for in the considera-- tion of the grant, and an action cannot be maintained therefor.. It may be safely assumed that the grantors, in making their grant of the right of way, were familiar with the character of:

the land over which the road was to pass; that they knew of the elevations and depressions in the surface of the soil; that they were familiar with the surrounding country, and knew the general direction of its drainage, and the consequent interruption of its surface flow by the construction of embankments, digging of ditches, and the erection of culverts, such as are generally used in the building of railroads upon level prairies; that they must have known that in the depressions the excavations at the sides were liable to be of considerable depth, and that, in case of high water or general overflow, were liable to be filled with surface water, and to be discharged through the usual culverts upon adjoining lands; that they were familiar with the usual and ordinary methods of constructing railroads; that the earth for the construction of the necessary embankments must be obtained from the right of way, and that these excavations would be of greater or lesser depth according to the elevation or depression of the soil crossed by such road; and that the culverts for the protection of the road-bed, and to prevent accumulation of surface water along the line, would be constructed of the size, and with the frequency, usual and ordinary in such cases, consistent with careful and skillful engineering in the construction of such roadways.   And if the company defendant did no more than might have reasonably been expected it would do, and if it did the work in the manner it might reasonably be expected it would be done, how can it be said that the work was negligently done, or that the defendant had committed a wrongful act, subjecting it to an action for damages thereby sustained?   And how can it be urged that the plaintiff can have and maintain an action for injuries contemplated in, and naturally presumed to flow from, the acts licensed to be done, and for which compensation for consequent damages had been agreed upon and paid?

It has now become the settled law of this country and England that the right of way obtained under their charter permits railroads to use steam-engines in propelling their trains; and that if, in the necessary use of fire for the production of steam

for such purpose by the usual and best approved appliances, without negligence, sparks escape, and set on fire the premises of adjacent owners of property, such loss must be borne by the owner as one of the incidents of the operation of railroads; that the license to operate the road carries with it the right to use the dangerous elements necessary to its operations, when used in the ordinary manner, and by the means and appliances generally adopted and approved by other roads in the locality. *Vaughan* v. *Railway Co.*, 5 Hurl. & N. 678; 1 Thomp. Neg. 152, American authorities cited.

It is true that the legislature in granting the right to construct these great highways and arteries of commerce, and to maintain and operate the same by dangerous agencies, imposes upon the corporations a degree of skill and care in their construction and operation commensurate with the nature of the work and the agencies employed; but, when a compensation is awarded for consequent damages, the presumption is that it is in payment of the proximate injury contemplated and reasonably expected to result therefrom, and the degree of care and skill required of the company and its agents will be graduated by the character of the work and the agent employed. If the agent employed is fire, the highest degree of skill and care in its management and control is expected and demanded to protect the property adjacent from injury or destruction. Yet, as we have seen in such cases, no greater or higher degree of care or skill is demanded than that ordinarily used and employed by other roads of like character and construction; and that to require more would be to exact of the particular company extraordinary skill and care. Would it be contended that if defendant had, in constructing its road, cut down and removed from its right of way large and overhanging trees, whereby the plaintiffs became injuriously affected by sunlight and winds, that the company would be subject to this action for damages? Would it be contended, if the defendant, in the construction of its road in the usual manner, constructed across some ravine so high an embankment that thereby great quantities of snow were blown by the wind,

and lodged upon the plaintiff's land, by which they sustained injury, that this case could be maintained? Would it be contended that if, in the ordinary construction of its road, the necessary erection of covered bridges or higher embankments interfered with the comforts or convenience of the plaintiffs by intercepting or diverting their rays of light or heat, or by the destruction of their grounds in digging down its hills or filling up its lakes,—would it be contended that, in any of these cases in which the right of the plaintiffs to the free and unrestricted enjoyment of one or all the elements had been cut off or intercepted by the construction of defendant's road in the ordinary use of its chartered powers, they were not compensated in the purchase of the right of way?

But it is contended that compensation for the right of way included only the ordinary damages that would arise from the construction of the road across the premises granted or condemned; that it does not, and is not intended to, include damages extraordinary; or, as the books say, it includes only "damages reasonably expected to flow from the construction and maintenance of the work;" and therefore that the action for extraordinary damages will lie against the owner of the right of way, notwithstanding the grant or award of condemnation. And the charge of the court seems to have proceeded upon this theory. The jury were instructed that, in case of acquiescence, etc., by plaintiffs, "they could not recover for the ordinary damage arising therefrom." The learned judge, however, proceeds to say: "But the damage caused to the plaintiffs' land, if any, by the discharge of large and unusual quantities of water from other lands, if such discharge occurred, would not be *ordinary damage* arising from the proper construction of such embankment." This instruction is not only open to the objection that it trenches upon the province of the jury in determining by the court what it is their duty to determine, to-wit, what was not ordinary damage, but it gave the jury to infer that, while the defendant might not be liable for *ordinary*, it would be liable for *extraordinary* damage, caused by the construction of its road and embankments

across plaintiffs' land.  It does not follow that, because a rail-
road company is not required to make compensation in advance
for extraordinary damages that may result from the construction
of its road, that it will be liable in a subsequent action for such
damages as were not in fact contemplated or considered in de-
termining the amount of such consideration or award.  The com-
missioners or jury who are required to determine the amount of
damages likely to result from the probable acts of a railroad
company in constructing its road along a given right of way act
as a judicial tribunal determining cases of damages or injury to.
real property in advance of the act committed, and, while they
may not be so exact in arriving at the real injury or damage
suffered as they might be if the acts had been already done, and
the results were visible, yet they are in each case governed by
certain fixed rules of evidence, and the result of their delibera-
tion is a judicial determination, and includes in it all the dam-
age to which the party is entitled as compensation for the com-
mission of an otherwise wrongful act.  And as it would hardly
be contended that, after a party had recovered in a civil action
for the ordinary damages resulting from a wrongful act, that he
could be permitted subsequently to sue and recover for the extra-
ordinary damages resulting from the same injury, no more can
it be permitted to the party injured, who has received compen-
sation for the ordinary injury, to bring a subsequent action for
the extraordinary damage resulting from the same act.  Not only
would such a proceeding, if permitted, require the courts to dis-
tinguish, and the jury to find, what portion of the damage was
the result of ordinary, and what portion of extraordinary, injury,
but it would break down the long and well-established principles
upon which awards and judgments of courts are founded, to-wit,
that they are presumed to cover not only what was, but what
might have been, determined by them ; and the grant, as we have
seen, is open to the same reasoning as the award of commission-
ers.  It is true that, in cases of right of way, the commissioners
are not presumed to take into consideration damages extraordi-
nary; but that is a mere rule of evidence, and does not affect the

presumption arising from the rendition of the award, or from the payment of the consideration of the deed. The legislature has the power to make the award as limited or comprehensive as it may choose. Our legislature has made provision for not only the most extended inquiry by the commissioners, but it has given them the broadest latitude in matters of damage or compensation. Section 452, Civil Code, provides that "the commissioners shall inspect said real property, and consider the injury which such owner may sustain by reason of such railroad; and they shall assess the damages which such owner will sustain by such appropriation of his land." It is true that, under the broad provisions of our statute, the commissioners are not, in terms, confined to ordinary damages; but the law presumes that only the usual and ordinary damages are taken into consideration in determining such injury, because it is only against such injury as is caused by its negligence that the company is bound to provide in the construction of its works, under the American and modified English doctrine. The doctrine of the English exchequer, announced in *Fletcher* v. *Rylands*, 3 Hurl. & C. 774, that "one who brings upon his land anything which would not naturally come upon it, and which is in itself dangerous, and may become mischievous, if not kept under proper control, though in so doing he may act without personal willfulness or negligence, will be liable in damages for any mischief thereby occasioned," has been much modified by the English courts, and has never been received with approval by our courts. And it may be said with safety that the generally approved American doctrine is that negligence is the proper basis of recovery in such actions. Any other rule in our country would strike a blow at all great works of improvement, and become disastrous in its results. The rule has also in England had placed upon it many restrictions, and has received material modifications. In *Nichols* v. *Marsland*, L. R. 10 Exch. 255, (affirmed on appeal,) it appeared that the defendant was the owner of a series of artificial ornamental lakes, which had existed for a great number of years, and had never, previous to the 18th day of June, 1872, caused

any damage.   On that day, however, after a most unusual fall
of rain, the lakes overflowed, the dams at their lower ends gave
way, and the water out of the lakes carried away the county
bridges lower down the stream.   The jury found that there was
no negligence either in the construction or the maintenance of
the reservoirs, but that, if the flood could have been anticipated,
the effect might have been prevented.   Upon these facts, BRAM-
WELL, B., delivering the judgment of the court of exchequer,
says: "In this case I understand the jury to have found that all
reasonable care had been taken by the defendant; that the banks
were fit for all events to be anticipated, and the weirs broad
enough; that the storm was of such violence as to be properly
called the act of God, or *vis major.*   No doubt, as was said by
the counsel for the plaintiff, a shower is the act of God as much
as a storm.   So is an earthquake in this country.   Yet every
one understands that a storm, supernatural in one sense, may
properly, like an earthquake in this country, be called the act of
God, or *vis major;* no doubt, not the act of God, or *vis major,* in
the sense that it was physically impossible to resist, but in the
same sense that it was practically impossible to do so.   Had
the banks been twice as strong, or, if that would not do, 10 times
as strong, and 10 times as high, and the weirs 10 times as wide,
the mischief might not have happened.   But these are not prac-
tical conditions.   They are such that to enforce them would
prevent the reasonable use of property in the way most beneficial
to the community.   So understanding the finding of the jury, I
am of the opinion the defendant is not liable."

And this is in accordance with the American doctrine as an-
nounced by the supreme courts of the various states.   The Amer-
ican cases lay down the doctrine that, for damages accruing
from extraordinary floods, or other causes that may be attrib-
uted to the act of God, or which cannot ordinarily be foreseen
or prevented, there can be no liability.   See *China* v. *South-
wick,* 12 Me. 238; *Bell* v. *McClintock,* 9 Watts, 119; *Bridge Co.*
v. *Navigation Co.,* 4 Rawle, 9; *Everett* v. *Tunnel Co.,* 23 Cal.
225; *Hoffman* v. *Water Co.,* 10 Cal. 413; *Wolf* v. *Water Co.,* Id.

541; *Lapham* v. *Curtis*, 5 Vt. 371; *Higgins* v. *Canal Co.*, 3 Har. (Del.) 411; *Canal Co.* v. *Ryerson*, 27 N. J. Law, 457; *Tenney* v. *Ditch Co.*, 7 Cal. 335; *Richardson* v. *Kier*, 34 Cal. 63; *Shrewsbury* v. *Smith*, 12 Cush. 177, etc.

And the American doctrine is very well illustrated in *China* v. *Southwick*, cited *supra*, where A. erected a dam at the outlet of a pond, and thereby raised a head of water, but not so high as to overflow or injure a bridge at the head of the pond, belonging to B. A number of years afterwards, in consequence of great rains and a violent wind, the waters were thrown upon the bridge, and it was destroyed. It was held that A. was not liable to pay damages to B., for, "if there had been no dam, the injury might not have happened; but the defendant had a right to erect it, and that without being responsible for remote and unforeseen consequences." And the doctrine announced applies with still greater force to the facts of this case, in which it appears that the obnoxious ditches were not constructed for holding or conveying water, but were the natural and necessary excavations caused by the erection of the embankments required in the construction of defendant's road-bed.

It is in evidence by plaintiffs' own engineers that they knew of no other way of constructing railroads; that a trestle-work would be impracticable; and that these excavations were the usual and necessary ones caused in the erection of the embankment in question. But, suppose they had been constructed as water ditches for the carrying off the surplus water necessary for the protection of defendant's road-bed, would defendant have been required to have guarded against more than ordinary and usual surface flow? Would not a flood of the dimension and character proved in the case at bar have been *vis major*, or such unforeseen consequence as to avoid liability?

But we are not obliged to travel beyond the facts of the present case to speculate upon the rules of law governing the construction of ditches and reservoirs constructed upon the right of way for the convenience of the company or the protection of the road. The case at bar shows that the road-bed was constructed

in the usual and ordinary manner, with the usual and ordinary skill and precaution, and the defendant company was not required to use extraordinary skill or care in the construction of its embankments or culverts. It was not required to anticipate extraordinary floods or superhuman agencies. It had the right to dig up its right of way in the ordinary and usual manner, and to construct its culverts of the usual and ordinary size, with the usual frequency, to equalize the flow of the surface water. And if, by such usual and ordinary construction of its road, the surface of the earth was necessarily changed, and the currents of the surface water were interrupted and diverted, it was one of those ordinary incidents of railroad construction which might have been reasonably expected to have resulted from such work, and one that plaintiffs themselves were bound to have guarded against, and to have used such precautions as were in their power to remedy. Any other rule would require railroad companies in level countries to build their roads upon elevated trestle, or encounter the hazard of some disturbance of surface elements.

It may not be uninteresting, in this discussion, to glance at the authorities upon the question of what damages are included in the award of commissioners arising from the appropriation of the right of way by railroad companies. The case of *Walker* v. *Railroad Co.*, 103 Mass. 10, is a leading case. The jury appointed upon petition to the county commissioners, under the Massachusetts statute, had allowed for damages caused by defendant's obstructing the surface water by means of its embankments, and thereby turning it upon plaintiff's land. The defendant company claimed this was not a proper element of damages for the consideration of the jury, but the supreme court on appeal, holding it a proper matter for their consideration, says: "The injury from surface water turned back by the embankment of the railroad, and made to flow upon the petitioner's land, or prevented from escaping therefrom in the usual mode, was proper for the consideration of the jury in estimating his damages. Where there is a public, or even, as it would seem, a private, right or easement of drainage, it is the duty of the railroad cor-

poration to make suitable provision for it; and their failure to do so subjects them to an action of tort, but not to damages upon complaint. *Proprietors* v. *Railway Corp.*, 10 Cush. 385, etc. But no such duty exists in regard to surface water. The cuts and embankments and necessary gutters of the railroad track will unavoidably modify the flow of surface water, and sometimes cause damage by keeping it back, or projecting it in large quantities upon lands adjoining the road. Injuries to lands from such causes would seem clearly to fall within the class of effects which have been held to afford ground for the assessment of damages under the statute. *Dodge* v. *County Com'rs*, 3 Metc. 380," etc. In *Munkres* v. *Railroad Co.*, 72 Mo. 514, the following instruction given by the court below to the jury was held to be good law by the supreme court on appeal: "The relinquishment of the right of way read in evidence authorized the railroad company to enter upon the plaintiff's lands, and construct its road, in the usual manner of building roads, by throwing up and raising the ground for the road-bed, and by cutting ditches along the sides of the road to keep the water off the track. If, therefore, you find, from the evidence, that the road-bed and bridges were constructed with reasonable care and skill with reference to the use of the same for railroad purposes, and the plaintiff has been incidentally injured by the collection and flow of surface water upon his lands caused by the construction of the road, he is without remedy for such injury. The railroad company was not bound to make ditches larger or longer than was necessary to secure its road-bed. It was not bound to make ditches to protect the plaintiff's land from injury from surface water which might collect along the road." And, for a full and complete citation and collection of the authorities on this subject, see 1 Thomp. Neg. 568*n*.

But it is contended that, although the injury was one that may have been reasonably contemplated by the parties in the purchase of the right of way, that it did not come within such grant, and was not compensated for by the consideration of the grant, because it was the duty of the defendant to have guarded

against such surface water, and to have provided means for its removal. And in support of this theory there was evidence tending to prove that several miles distant from the plaintiffs' land was a coulee somewhat larger than the others, and there was some evidence tending to show that a ditch might have been dug of sufficient depth to have carried the surface water to, and to have discharged it into, this coulee; but this theory was strenuously combated by the engineers of the defendant, and it satisfactorily appears, from all the evidence, that the conduction of the stream of water along the side of the defendant's right of way, if practicable, would have had a tendency to have seriously impaired the strength and solidity of the road-bed, and the safety of the public, in the operation of the road itself. This theory of plaintiffs' the learned judge who tried the case seems to have had in mind, and to have approvingly submitted to the jury in the following words: "In the construction of its railroad it was the duty of the defendant to take into consideration the surface and nature of the country through which it was constructed, and, in the construction of its road-bed, culverts, and ditches, to use ordinary and reasonable care to prevent injury to plaintiffs' property. And if you find that, by the construction of such railroad, ditches, and culverts in the manner in which they were constructed, surface water which would not otherwise have flowed onto plaintiffs' land was collected, conveyed to, and discharged upon plaintiffs' land in large and unusual quantities, and that, by the use of reasonable skill and care, defendant's road-bed, culverts, and ditches might have been so constructed as to permit such surface water to diffuse itself in its natural course over the surface of the country, or *to conduct and discharge into natural channels,* then the plaintiffs are entitled to recover, should you find that they suffered damages by such discharge of such surface water upon their land." The court uses the words "natural channels," without distinguishing surface-water channels from natural water-courses. It does not appear that this coulee was a natural water-course,—that it had any defined channel with bed, banks, or any of the *indicia* of the *water-course* at com-

mon law. And it appears to have differed from the other depressions or coulees only in its size; and the defendant would clearly have been a trespasser in conducting the surface water in question by an artificial channel along its right of way, contrary to the ordinary usage and experience in railroad building, and in discharging the accumulated amount into the coulee described. The defendant would only have succeeded in shifting the burden of the accumulated surface water from the plaintiffs' to another's land, and to have given to that other an undoubted right of recovery in place of the doubtful right claimed by the plaintiffs here. In a recent case in Minnesota,—*Hoganon* v. *Railway Co.*, 17 N. W. Rep. 374,—the defendant sought to do what the plaintiffs claim it should have done here. The railway company being burdened with accumulated surface water, it sought by the construction of a ditch along and off its right of way to relieve itself of such accumulations, but a land-owner several miles from the mouth of the ditch so constructed, being injuriously affected by the water therefrom, brought his action, and recovered of the company, for turning its surface water, by means of artificial channels, upon his land where there was no natural water-course. The defendant in that action was defendant in this, and, profiting by its experience in that state, it has here sought to avoid constructing channels to conduct off its surface water, and has contented itself with constructing culverts at the various depressions of the surface along its right of way, for the purpose of equalizing its flow, and not for the purpose of conducting it to or from plaintiffs' land. This it clearly had a right to do. Beyond that it would have gone at its peril.

Upon the case as made the plaintiffs had no cause of action, and the defendant's request to direct the verdict should have been granted. The judgment is reversed, and a new trial ordered.

All the justices concur.